### CONTINUATION OF APPLICATION FOR A SEARCH WARRANT

I, Special Agent Mallorie Campbell, being first duly sworn, hereby state:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been since December of 2021. I am currently assigned to the Detroit Field Division, Grand Rapids Field Office. I am also a participating member of the City of Kalamazoo Department of Public Safety ("KDPS") Kalamazoo Valley Enforcement Team ("KVET"). I have had extensive training at the Federal Law Enforcement Training Center in both the Criminal Investigator Training Program and ATF Special Agent Basic Training.

2. Prior to becoming a Special Agent with ATF, I was employed as a Sheriff's Deputy with the Jefferson County Sheriff's Office in Louisville, Kentucky, for approximately eight years. While with the Jefferson County Sheriff's Office, I was assigned to the Federal Bureau of Investigation's Louisville, Kentucky, White Collar Crimes Task Force for approximately four years. As an FBI Task Force Officer and as a Special Agent with the ATF, I have participated in numerous state and federal investigations to include, among others, theft from Federal Firearms Licensees ("FFLs"), other firearms investigations, financial crimes, healthcare fraud, illegal narcotics investigations, gang investigations, and human trafficking investigations.

3. The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This Continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Because this Continuation is being submitted for the limited purposes describe above, I have not included each and every fact

known to me concerning this investigation. I have set forth only the facts I believe necessary to establish probable cause.

4. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the following electronic device and its contents:

> **a. Subject Device**: a black iPhone, model 12 in a brown Nike brand "JUST DO IT" case, located on Raekwon JACKSON's person during his arrest and currently held at the Kalamazoo Department of Public Safety in Kalamazoo, Michigan, in the Western District of Michigan.

5. I submit that there is probable cause to believe that the **Subject Device** contains evidence of violations of federal law, specifically Raekwon JACKSON's possession of a firearm as a convicted felon, in violation of 18 U.S.C § 922(g)(1), possession of a machinegun in violation of 18 U.S.C § 922(o), and possession with intent to distribute controlled substances, in violation of 21 U.S.C § 841(a)(1).

6. The applied-for warrant would authorize the forensic examination of the **Subject Device** for the purpose of identifying electronically stored data particularly described in Attachment B. There is also probable cause to search the information described in Attachment A, the Subject Device, for evidence instrumentalities, contraband, and/or fruits of these crimes as further described in Attachment B.

## **PROBABLE CAUSE**

7. On or about February 17, 2024, a Kalamazoo Department of Public Safety ("KDPS") detective observed a video posted on Facebook by user "Dthang," known to the detective as Duane Malory. In the video, posted to Malory's Facebook profile story, Malory was filming himself driving a car, which appeared to be a Chevy Malibu based on the interior. He was wearing a black, hooded

sweatshirt with yellow writing on the front and a black, knit hat with yellow flames. During the video, Malory panned the camera to his lap where you could see a tan Glock-style pistol with a black slide, black rubber grip around the handle, a black laser sight, and an extended magazine.

8. Later the same day, a black Chevy Malibu was observed at the Citgo Gas Station, 1405 Portage Street, Kalamazoo, Michigan. The same detective that had seen the Facebook video saw Malory driving while wearing the same black, knit hat with yellow flames from earlier that day. JACKSON was identified by law enforcement from prior contacts as the front seat passenger. Based on the video posted by Malory hours before, officers suspected that Malory or JACKSON were in possession of a firearm.

9. Officers knew Malory did not have a valid driver's license.

10. Officers attempted a traffic stop on the vehicle, but Malory fled the scene in the Chevy Malibu, striking the side of the convenience store and a police cruiser in the process. During the encounter with the Malibu, an officer was able to deploy a successful Terminator stop stick (spike strip) to one of the tires.

11. As Malory drove away from police, a detective observed the vehicle come to almost a complete stop on Clinton Avenue. JACKSON exited the front passenger seat and began to run but dropped something on the ground. JACKSON quickly picked up the item, secured the item in his waistband, and then ran along Clinton to the first house on the south side of the road, 818 Clinton Avenue. JACKSON ran down the driveway of 818 Clinton to the garbage can at the end along a fence. JACKSON then opened the garbage can, reached into this waistband and removed a firearm. JACKSON tossed the firearm into the garbage can, then jumped the fence and ran approximately three blocks before he was captured by an officer and taken into custody by the police.

12. The detective who had observed JACKSON discard the firearm remained with the firearm while JACKSON jumped the fence. The detective secured the firearm from the garbage can and placed it into KDPS evidence.

13. Twenty rounds of ammunition were found in the firearm.

14. After JACKSON was detain by other officers, he was searched. Officers located the **Subject Device**, an amount of marijuana well over the legal amount permitted under Michigan law, and a functional digital scale. The digital scale appeared to have marijuana residue on it.

15. During a later search of the Chevy Malibu that Malory and JACKSON had been observed in prior to and during the pursuit, officers located Psilocybin mushrooms in the center console within reach of both JACKSON and Malory. Psilocybin is a Schedule I controlled substance in Michigan and is illegal to possess.

16. A LEIN check was conducted, and officers determined that JACKSON had a prior felony weapons conviction, specifically a violation of MCL 750.227 from 2019, and is prohibited from possessing firearms and / or ammunition.

17. Special Agent Theodore Westra, who is recognized by the ATF as having expertise in the interstate nexus of firearms, determined that both the Polymer80 .40 caliber pistol, and the 20 rounds of ammunition loaded into the firearm traveled in or affected interstate commerce.

18. The Polymer80 .40 caliber pistol was determined to have a machinegun conversion device installed. A machinegun conversion device, commonly called a "switch," allows a semiautomatic firearm to fire as an automatic weapon. Possession of a switch is a violation of 18 U.S.C § 922(o).

19. The switch was sent to the ATF Firearms & Ammunition Technology Division for further examination. The switch was determined to function as a machinegun, firing multiple rounds of

ammunition with one pull of the trigger. The switch was also determined to meet the definition of a "machinegun" as defined in 26 U.S.C. § 5845(b).

## OFFICER TRAINING AND EXPERIENCE

20. Based on my training and experience, I understand the following:

    a. iPhones have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, as well as other evidence of illegal firearms violations, including but not limited to possessing firearms by a convicted felon, possessing or purchasing ammunition by a convicted felon, purchasing or possessing devices that illegally convert firearms to machine guns, and purchasing, possessing, and manufacturing privately made firearms (also known to the general public as "ghost guns") as a convicted felon;

    b. Cell phone users normally keep their cell phones on or near their person, within vehicles they are associated with, and within their residences;

    c. Global Position System ("GPS") data on phones may show the location of an individual illegally possessing and / or purchasing a firearm, a machine gun, ammunition, a device that converts a firearm into a machine gun, a privately made firearm, as well as other individuals illegally distributing and manufacturing these items, which may provide corroborating evidence of any or all of these crimes;

    d. Individuals who use cell phones to access a cellular network knowingly or unknowingly leave a GPS footprint by utilizing cellular data. These individuals often use cell phones and social media platforms to post or tag themselves at various locations, as well as post

or tag other individuals with them; iPhones have the ability to access social media platforms via the internet and/or "applications" (commonly referred to as "apps");

e. iPhones have the ability to conduct financial transactions through apps that allow the user to access their bank or to transfer money to other individuals through online money transfer programs including but not limited to Cash App and Venmo;

f. Purchases of "ghost guns" or the parts used to make such a gun are commonly done via online purchase using a credit card, a banking app, or a cash transfer app;

g. Purchased of "ghost guns" or the parts used to make one are commonly done online using websites to cater to such purchases;

h. Individuals who are involved in illegal firearms violations often keep names, aliases, and/or contact information of suppliers, purchasers, manufacturers, and others involved in illegal firearms violations in their devices;

i. Individuals who illegally possess firearms and ammunition often use cell phones to acquire, document possession of, and distribute firearms and ammunition using text messaging, photographs/videos, calls, emails, social media, etc;

j. Individuals who illegally possess firearms often use cell phones to advertise and sell their firearms, sometimes after being used in a crime, by using text messaging, photographs/videos, calls, emails, social media, etc;

k. Individuals generally purchase machinegun conversion devices from other countries via the internet. Individuals commonly utilize their cell phones to make these internet purchases, including the use of credit card and/or banking or cash transfer apps;

l. A digital scale is a common tool of drug dealers who use it to weigh out different increments of drugs for sale.  It is common for drug dealers to store their drugs in multiple

    ways including some packed in a larger quantity as well as having multiple smaller packages for ease of distribution. Dealers will often take smaller amounts of their drugs after weighing them out and package them in separate increments for sale, enabling them to make a larger profit;

  m. Drug dealers commonly use cell phones to communicate with potential purchasers of narcotics to discuss the availability and price of, as well as coordinate a time for purchase. This communication is often done via text messaging, calls, emails, social media, etc;

  n. Drug dealers will often sell multiple drug types to appeal to a larger customer base; and

  o. It is common for drug dealers to possess firearms during drug transactions in order to protect their drugs and drug sale proceeds from robbery.

## TECHNICAL TERMS

21. Based on my training and experience, I use the following technical terms to convey the following meanings:

  a. Wireless telephone: A wireless telephone (also called a mobile telephone, cellular telephone, or cell phone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone including successful and unsuccessful video call connections. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and

    storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include GPS technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices

can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system technology for determining the location of the device.

f.  IP Address: An internet protocol address (or simply "IP address") is a unique numeric address used by computers on the internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer

attached to the internet must be assigned an IP address so that internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

21. Based on my training, experience, and research, I know that the **Subject Device** has capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and /or PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device and other evidence of criminal activity.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22. Based on my knowledge, training, and experience, I know that electronic devices can store information, including internet searches and websites accessed, for long periods of time. This information can sometimes be recovered with forensics tools.

23. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Device** was used, the purpose of that use, and the time of use. Forensic evidence on a device can also indicate who has used or controlled the device and when. Forensic examination is necessary because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Device** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

25. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto any premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

26. I submit that this affidavit supports probable cause to believe that on the **Subject Device** there will be evidence, fruits, and instrumentalities of the following offenses: 18 U.S.C § 922(g)(1), 18 U.S.C § 922(o), and 21 U.S.C. § 841(a)(1).

27. Accordingly, I request that the Court issue the proposed search warrant described in Attachment A for items listed in Attachment B.